## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| LOUIS PAUL OUGEL, SR., | * | **CIVIL ACTION NUMBER: 2:15-cv-4064** |
| ANTHONY OUGEL, JR., | * | |
| MICHAEL J. OUGEL, | * | |
| THERESA ANN OUGEL DUCOTE, | * | |
| RUSSELL JOSEPH OUGEL, | * | |
| LISA OUGEL, GUITERREZ, | * | |
| CHARLES OUGEL, | * | |
| PATRICIA ANN OUGEL BURNSIDE and | * | |
| ANNA OUGEL GUIDRY | * | |
| *Plaintiffs* | | |
| vs. | * | |
| BOEHRINGER INGELHEIM | * | |
| PHARMACEUTICALS, INC., | | |
| | * | |
| BOEHRINGER INGELHEIM PHARMA | | |
| GMBH & CO. KG, | * | |
| BOEHRINGER INGELHEIM | * | |
| INTERNATIONAL GMBH and | | |
| | * | |
| BIDACHEM S.P.A. | | |
| *Defendants* | * | |

\*       \*       \*       \*       \*       \*       \*

## PLAINTIFF'S ORIGINAL COMPLAINT

LOUIS PAUL OUGEL, SR., *appearing individually and as the duly appointed representative of the Succession of Anthony Ougel*, ANTHONY, OUGEL, JR, MICHAEL J. OUGEL, THERESA ANN OUGEL DUCOTE, RUSSELL JOSEPH OUGEL, LISA OUGEL GUITIERREZ, CHARLES OUGEL, PATRICIA ANN OUGEL BURNSIDE and ANNA OUGEL GUIDRY, plaintiffs, bring this action against defendants, BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG, "BOEHRINGER INGELHEIM" or "Defendants") for selling, distributing, and manufacturing the defective and unreasonably dangerous drug Pradaxa™ (dabigatran etexilate), a prescription medication used as a blood thinner in the United States, which proximately caused the death of Plaintiff's father, Anthony Ougel, Sr. as further set forth below.

### PARTIES

### 1.

**PLAINTIFFS:**

Anthony Ougel, Sr. was married but once and then to Ida Kay Landry Ougel who predeceased him. Of this union nine children were born namely the nine plaintiffs listed in sub paragraphs A through I below. Anthony Ougel, Sr. had no other children nor did he adopt any other children.

### A.

LOUIS PAUL OUGEL, SR., is a citizen and resident of Loranger, Tangipahoa Parish Louisiana, and was confirmed as the Administrator and Succession Representative of the Succession of Anthony Ougel, (Anthony Ougel, Sr.) docket number 2014-0030298, division "E",

of the 21st Judicial District Court for the Parish of Tangipahoa, State of Louisiana on September 16, 2014. LOUIS PAUL OUGEL, SR. is one of the nine surviving children of Anthony Ougel, Sr. and in his individual capacity and as the Administrator and Succession Representative of the Succession of Anthony Ougel, Sr. identified above. LOUIS PAUL OUGEL, SR. asserts this survivor's and wrongful death action against the defendants *in solido* for such damages as may be reasonable in the premises.

B.

ANTHONY OUGEL, JR. is a citizen and resident of Tickfaw, Tangipahoa Parish Louisiana. ANTHONY OUGEL, JR. is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

C.

MICHAEL J. OUGEL is a citizen and resident of Tickfaw, Tangipahoa Parish Louisiana. MICHAEL J. OUGEL is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

D.

THERESA ANN OUGEL DUCOTE is a citizen and resident of Tickfaw, Tangipahoa Parish Louisiana. THERESA ANN OUGEL DUCOTE is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this

3

survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

E.

RUSSELL JOSEPH OUGEL is a citizen and resident of Tickfaw, Tangipahoa Parish Louisiana. RUSSELL JOSEPH OUGEL is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

F.

LISA OUGEL GUITERREZ is a citizen and resident of Montz, St. Charles Parish Louisiana. LISA OUGEL GUITERREZ is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

G.

CHARLES OUGEL is a citizen and resident of Kenner, Jefferson Parish Louisiana. CHARLES OUGEL is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

H.

PATRICIA ANN OUGEL BURNSIDE is a citizen and resident of Loranger, Tangipahoa

4

Parish Louisiana. PATRICIA ANN OUGEL BURNSIDE is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

I.

ANNA OUGEL GUIDRY is a citizen and resident of Jasper, Walker County Alabama. ANNA OUGEL GUIDRY is one of the nine surviving children of Anthony Ougel, Sr. and in accordance with Louisiana Civil Code Article 2315 et seq., asserts this survivor's and wrongful death action against the Defendants *in solido*, seeking all such damages as may be reasonable in the premises.

J.

Hereinafter, the above-referenced parties may be referred to as "Plaintiffs." When the term "Plaintiffs" is used, it shall be understood to include all of the parties listed under paragraph 1.

**2.**

**DEFENDANTS:**

A.

BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. ("Boehringer US") is a Delaware corporation, which has its principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877.  Boehringer US has conducted business and derived substantial revenue from within the State of Louisiana.  Boehringer US may be served at 900 Ridgebury Road, Ridgefield, Connecticut 06877.

B.

5

BOEHRINGER INGELHEIM PHARMA GMBH & CO. KG ("Boehringer Pharma") is a foreign corporation with its principal place of business located at Boehringer Ingelheim Pharma GmbH & Co. KG, Binger Strasse 173, 55216 Ingelheim am Rhein, Germany.  Boehringer Pharma has transacted and conducted business within the State of Louisiana.  Boehringer Pharma has derived substantial revenue from goods and products disseminated and used in the State of Louisiana, and Boehringer Pharma expected or should have expected their acts to have consequences within the State of Louisiana, and derived substantial revenue from commerce within the State of Louisiana.

C.

BOEHRINGER INGELHEIM INTERNATIONAL GMBH ("Boehringer International") is a foreign corporation with its principal place of business located at Boehringer Ingelheim International Gmbh, Binger Strasse 173, 55216 Ingelheim am Rhein, Germany.  Boehringer International has transacted and conducted business within the State of Louisiana.  Boehringer International has derived substantial revenue from goods and products disseminated and used in the State of Louisiana and Boehringer International expected or should have expected their acts to have consequences within the State of Louisiana, and derived substantial revenue from commerce within the State of Louisiana.

D.

BIDACHEM S.P.A. ("Bidachem") is a foreign corporation with its principal place of business located at Bidachem S.p.A., Strada Statale 11, (Padana Sup.) N.8, 24040 Fornovo S. Giovanni, Bergamo, Italy.  Bidachem has transacted and conducted business within the State of Louisiana.  Bidachem has derived substantial revenue from goods and products disseminated and

used in the State of Louisiana, and Bidachem expected or should have expected their acts to have

consequences within the State of Louisiana, and derived substantial revenue from commerce

within the State of Louisiana.

F.

Hereinafter, the above-referenced parties may be referred to as "Defendants." When the

term "Defendants" is used it shall be understood to include all of the parties listed under

Paragraph 2.

**JURISDICTION AND VENUE**

**3.**

Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1332 for the reason that there

is complete diversity of citizenship between Plaintiffs In Intervention and Defendants and the

matter in controversy greatly exceeds the sum of seventy-five thousand dollars ($75,000.00),

exclusive of interest and costs.  This Court has jurisdiction over the non-resident Defendants

because they have done business in the State of Louisiana,  have committed a tort in whole or in

part in the State of Louisiana, and have continuing contacts with the State of Louisiana.

**4.**

Venue is further proper in this Court pursuant to 28 U.S.C. § 1391(b) because a

substantial part of the events giving rise to Plaintiffs' claims occurred, in part, in the Eastern

District of Louisiana .  Specifically, Plaintiffs, suffered injuries in the State of Louisiana and in

Tangipahoa Parish as a result of Anthony Ougel's  ingestion of or exposure to Pradaxa™.

Defendants promoted and sold Pradaxa™ in this State and in Tangipahoa Parish.

## UNDERLYING COMMON FACTS

### 5.

Defendants, directly or through their agents, servants or employees, are and at all relevant times have been engaged in the business of formulating, designing, manufacturing, licensing, testing, advertising, marketing, warranting, selling, distributing, and introducing into the stream of commerce a drug compound known as "dabigatran etexilate," which Defendants have sometimes marketed under the brand name "Pradaxa." Regardless of the name under which Defendants marketed, sold, and distributed the drug, all of its forms were and are, for all purposes relevant to the claims of Plaintiffs In Intervention, chemically and pharmacologically identical. Plaintiffs In Intervention, for purposes of this Complaint, will refer to the drug compound by the common brand name, "Pradaxa™."

### 6.

Pradaxa™ was approved by the Food and Drug Administration ("FDA") in October of 2010, for prevention of stroke in patients with non-valvular atrial fibrillation. Pradaxa™ is an oral anticoagulant and is from the class of the direct thrombin inhibitors ("DTI"). According to the Defendants' website, Pradaxa™ is "at the forefront of a new generation of oral blood thinning treatments, which prevent blood clots from forming in the body than can lead to devastating strokes in patients with atrial fibrillation. Potent antithrombotic effects are achieved with DTIs by specifically blocking the activity of thrombin (both free and clot-bound), the central enzyme in the process responsible for thrombus formation."[1] Indeed, Pradaxa™ is the first new

---

[1]http://www.boehringer-ingelheim.com/products/prescription_medicines/stroke_prevention.html

treatment alternative to Warfarin (Coumadin) in nearly 60 years.

## 7.

Pradaxa™ was launched by Defendants in North America in 2010.  Defendants designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold Pradaxa™ as a blood-thinning medicine primarily used to reduce the risk of stroke and blood clots in people with atrial fibrillation not caused by a heart valve problem.

## 8.

According to the Defendants' marketing and informational materials, referenced in the paragraphs below, and widely disseminated to the consuming public, atrial fibrillation ("AF") is the most common sustained heart rhythm condition in the world, with one in four adults over the age of 40 developing the condition in their lifetime.[2]

## 9.

As the Defendants state on their website, "[AF] is a type of irregular heartbeat.  It occurs when one or both of the upper chambers of the heart—called the atria—beat erratically.  This puts them out of sync with the heart's 2 lower chambers—called ventricles."[3]  Because the atria are primer pumps for the two large ventricles, AF normally causes only a modest reduction in cardiac output.  But in the "dead zone" of the malfunctioning atria, blood clots may form and then travel to the lungs or brain, where irreversible and potentially life-threatening damage may occur.[4]

---

[2] http://www.boehringer-ingelheim.com/news/news_releases/2011/4_aug_2011_dabigatran.html

[3] http://www.pradaxa.com/understanding-afib.jsp

[4] Institute for Safe Medication Practices, Quarter Watch Report, January 12, 2012

**10.**

Defendants claim that approximately one percent of the total population is affected by AF worldwide, or approximately 70+ million people in the world, and more than 2 million people in the United States alone have AF.  AF is a disease that typically has an impact on aging populations, and indeed, its prevalence increases with age.

**11.**

Defendants posit that AF is not a directly life-threatening condition, but in their marketing materials, Defendants state that AF can have serious and even deadly consequences for patients.  Defendants further declare that patients with AF are more likely to experience the development of a blood clot in their heart, especially if their condition is left untreated.  If such a clot were to form, the blood clot could break loose, and after breaking loose, the clot can be washing into the brain, where it can block an artery and cause a stroke.  Defendants state that patients with AF thus "have a five-fold increased risk of stroke when compared to people without atrial fibrillation.  Up to three million people worldwide suffer strokes related to AF each year.  Strokes due to AF tend to be severe, with an increased likelihood of death and disability."[5] Defendants claim their medication, Pradaxa™, is the answer to the worldwide problem of strokes and blood clots in those with AF.  They claim, "Many AF-related strokes can be prevented with appropriate medicinal therapy.  For this, substances are used which act on the blood clotting system and shall prevent blood clots from forming."[6]

---

[5] http://www.boehringer-ingelheim.com/products/prescription_medicines/stroke_prevention.html

[6] *Id.*

**12.**

Historically, conditions such as AF have been treated with the prescription drug Warfarin, which is a form of rat poison.  Warfarin blocks the formation of the tiny fibrin threads that help hold together the platelets that collect in a person's blood to form a blood clot.  Like all blood thinners, Warfarin can cause bleeds.  Warfarin has two other noteworthy limitations: (1) it requires blood tests every 1 to 4 weeks to establish the optimal level of anticoagulation, and (2) it interacts (negatively) with scores of other drugs, including drugs frequently used in heart patients. In spite of these apparent limitations; however, Warfarin also has an important benefit; if an overdose or unexpected bleed occurs, an antidote (e.g., vitamin K) is readily available and highly effective.[7]

**13.**

According to Defendants' testing and marketing materials, which extol the supposed benefits and virtues of Pradaxa™, Pradaxa™ had fewer drug interactions than Warfarin, and the frequent laboratory tests needed to manage Warfarin blood levels were not recommended for patients taking Pradaxa™.  Moreover, unlike Warfarin, which is adjusted for individual patient blood levels on an ongoing basis, Pradaxa™ was approved in an allegedly easy "one size fits all" dose of 150 mg twice a day.  This "one size fits all" characteristic of the drug, while simple for physicians to follows, means that a lower (or personalized) dose is unavailable and patients ingesting Pradaxa™ are not routinely monitored to see if they are getting too much of the drug's active ingredient, as are patients on other blood thinning medications like Warfarin.

---

[7]Institute for Safe Medication Practices, Quarter Watch Report, January 12, 2012

**14.**

Moreover, the "RE-LY Clinical Trial" (Randomized Evaluation of Longterm anticoagulant therapy) sponsored by Defendants concluded that vitamin K antagonists such as Warfarin are cumbersome to use because of their multiple interactions with food and drugs and because these drugs require frequent laboratory monitoring. The RE-LY Clinical Trial went on to suggest that there is a need for new anticoagulant agents that are effective, safe, and convenient to use (i.e., Defendants' product, Pradaxa™). The Defendants' marketing materials suggest that Pradaxa™ represented a therapeutic simplification and therapeutic progress because it does not require patients to undergo periodic monitoring with blood tests. A fundamental tenet of the RE-LY Clinical Trial was a claim by Defendants that Pradaxa™ was apparently safe to use as compared to Warfarin. As the Defendants highlight on their website in claiming Pradaxa™ generally has similar, but lower overall total bleeds versus Warfarin.[8]

**15.**

What the RE-LY Clinical Trial seemed to prove was quite simple: With Pradaxa™ there is (1) a higher rate of major GI bleeds (1.6% vs 1.1%) as compared to Warfarin; and (2) a similar rate of major bleeds (3.3% vs 3.6%) as compared to Warfarin. Additionally, Pradaxa™ appears to be particularly dangerous when used in older patients, as the label states: "The risk of major bleeds was similar with PRADAXA™150 mg and Warfarin across major subgroups defined by baseline characteristics, with the exception of age, where there was a trend towards a higher incidence of major bleeding on PRADAXA™ (HR 1.2, 95% CI: 1.0 to 1.4) for

---

[8]http://www.pradaxapro.com/safety.jsp

patients≥ 75 years of age."[9]  In spite of this reference regarding age, the label is still wholly inadequate because, among other reasons, this information was not conveyed in the warnings section.  In essence, the Defendants have created a new drug, Pradaxa™, that is no better than Warfarin from a safety perspective, and at best, perhaps slightly easier to use and administer.  The idea of this apparently easier-to-use anticoagulant evidently appealed to physicians, who were subject to extreme marketing and promotion by the Defendants, but it ignores patient safety.

## 16.

On February 14, 2011, the American College of Cardiology Foundation and American Heart Association added Pradaxa™ to their guidelines for management of non-valvular atrial fibrillation with a "Class I" recommnendation.  The endorsement, along with heavy marketing from the Defendants, caused sales of Pradaxa™ to skyrocket.  By the end of the first quarter of 2011, IMS Health's National Prescription Audit data showed 272,119 dispensed outpatient prescriptions.  But, as prescriptions mounted, reports of serious adverse drug events also surged.[10]

## 17.

As a result of the defective nature of Pradaxa™, persons who were prescribed and ingested Pradaxa™ for even a brief period of time, including Plaintiff herein, was at increased risk for developing life-threatening bleeds.  Due to the flawed formulation of Pradaxa™ (and unlike any of the traditional blood thinners on the market, Pradaxa™ has a questionable "one size fits all" dose), its levels in the blood are difficult or impossible to assess, and bleeds cannot be stopped

---

[9]http://www.accessdata.fda.gov/drugssatfda_docs/label/2012/022512s009Ibl.pdf

[10]Institute for Safe Medication Practices, Quarter Watch Report, January 12, 2012

since there is not known reversal antidote for this dangerous drug.

### 18.

In November 2011, Defendants confirmed as least 260 fatal bleeding events were reported in patients taking Pradaxa™ worldwide between March 2008 and October 2011.  The actual number of Pradaxa™ related deaths remains unknown at this time.

### 19.

Moreover, The Institute for Safe Medication Practices, reported that:

In the first quarter of 2011 [Pradaxa™] produced two different kinds of signals of major drug risk: a large volume of total serious reports, and large numbers of reports for a specific adverse event, hemorrhage.  Overall [the study] identified 932 serious adverse drug events of all types in which [Pradaxa™] was the primary suspect drug, including 120 patient deaths, 25 cases of permanent disability, and 543 cases requiring hospitalization. For the quarter, this was a higher total than for any drug [The Institute for Safe Medication Practices] monitor[s] with one exception.  In the Standardized MedDRA Query ("SMQ") for Hemorrhage, [Pradaxa™] accounted for 505 cases, more than any other drug.  (Warfarin ranked second with 176 cases.)  The 932 overall [Pradaxa™] cases in the first quarter [of 2011] included 293 cases that were also classified in the narrower gastrointestinal hemorrhage SMQ, more than any other regularly monitored drug.  An additional 120 cases contained event terms in the Hemorrhage stroke SMQ.  The strokes are of particular concern because if treatment intended to prevent ischemic strokes then causes hemorrhage strokes the risk/benefit balance is called into fundamental question.  In 65 hemorrhage cases overall, the patients died.[11]

In other words, the deadly consequences of Pradaxa™ use did not go unnoticed.

### 20.

On December 7, 2011, the FDA initiated an investigation into serious bleeding events associated with Pradaxa™ stating that the "FDA is working to determine whether the reports of bleeding in patients taking Pradaxa™ are occurring more commonly than would be expected, based on observations in the large clinical trial that supported the approval of

---

[11]Institute for Safe Medication Practices, Quarter Watch Report, January 12, 2012

Pradaxa™ [RE-LY trial]."

## 21.

Defendants concealed their knowledge that Pradaxa™ can cause life threatening

reversible bleeds from Plaintiffs' father, Anthony Ougel, Sr., other consumers, the general public,

and the medical community.  Indeed, the Defendants did not warn of the reversible nature of

Pradaxa™ in the "Warnings and Precautions" section of the products initial warning label.  The

only warnings provided by Defendants were as follows:

------------------------WARNINGS AND PRECAUTIONS------------------------

> Risk of bleeding: PRADAXA Xcan cause serious and sometimes, fatal bleeding.
> Promptly evaluate signs and symptoms of blood loss.  (5.1) Temporary
> discontinuation: Avoid lapses in therapy to minimize stroke (5.2)
> P-gp inducers and inhibitors: avoid co-administration of rifampin with PRADAXA
> because of the effects of dabigatran exposure (5.3).

## 22.

Specifically, Defendants did not adequately inform consumers and the prescribing

medical community about the risks of uncontrollable bleeds associated with Pradaxa™ usage, nor

did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a

bleed occur.  Even in the expanded "Warnings and Precautions" section of the initial label only the

following meager and unacceptably inadequate information was given:

**5.    WARNINGS AND PRECAUTIONS**

**5.1    Risk of Bleeding**

PRADAXA increases the risk of bleeding and can cause significant and, sometimes, fatal
bleeding.  Risk factors for bleeding include the use of drugs that increase the risk of
bleeding in general (e.g. anti-platelet agents, heparin, fibrinolytic therapy, and chronic use
of NSAIDs) and labor and delivery.  Promptly evaluate any signs or symptoms of blood
loss (e.g., a drop in hemoglobin and/or hematocrit or hypotension).  Discontinue

15

PRADAXA in patients with active pathological bleeding.

In the RE-LY (Randomized Evaluation of Long-Term Anticoagulant Therapy) study, a life-threatening bleed (bleeding that met one or more of the following criteria: fatal, symptomatic, intracranial, reduction in hemoglobin of at least 5 grams per deciliter, transfusion of at least 4 units of blood, associated with hypotension requiring the use of intravenous inotropic agents or necessitating surgical intervention) occurred at an annulized rate of 1.5% and 1.8% for PRADAXA 150 mg and Warfarin, respectively [*see Adverse Reactions (6.1)*].

**23.**

In fact, the only section of Defendants original label that references the fact that Pradaxa™ has no known "reversal agent" is buried in section 10 of the "Full Prescribing Information" section of the Pradaxa™ label, which discusses "Overdosage" on the medication. The language in section 10 is effectively no warning at all as the "warning" is both inadequate and misplaced, as shown below:

**10    OVERDOSAGE**

Accidental overdose may lead to hemmorhage complications.  There is no reversal agent for dabigatran.  In the event of hemmorhage complications, initiate appropriate clinical support, discontinue treatment with PRADAXA, and investigate the source of bleeding. Dabigatran is primarily excreted in the urine and shows low plasma protein binding. Therefore, dabigatran can be dialyzed with the removal of about 60% of drug over 2 to 3 hours; however, data supporting this approach are limited.  Measurement of PTT or ECT may help guide therapy. [*see Warnings and Precautions (5.1) and Clinical Pharmacology 12.2*].

**24**.

Finally, in January of 2012, after thousands of Pradaxa™ users had been killed or injured as a result of their ingestion of Pradaxa™, the Defendants belatedly initiated an extremely modest, and wholly inadequate, label change.  The only labeling modification Defendants made in January 2012, regarding the irreversible nature of Pradaxa™ bleeds was made in the "Warnings

and Precautions" part of the "Full Prescribing Information" section of the Pradaxa™ label, buried

in small print on the fifth and sixth pages of the label.  It reads:

5.      WARNINGS AND PRECAUTIONS

5.1     Risk of Bleeding
        PRADAXA increases the risk of bleeding and can cause significant and, sometimes, fatal
        bleeding.  Discontinue PRADAXA in patients with active pathological bleeding. [*see
        Dosage and Administration (2.2)*].
        ***
        Risk factors for bleeding include the use of drugs that increase the risk of bleeding in
        general (e.g. anti-platelet agents, heparin, fibrinolytic therapy, and chronic use of
        NSAIDs).  PRADAXA's anticoagulant activity and half-life are increased in patients with
        renal impairment. [*See Clinical Pharmacology (12.2.)*].

        A specific reversal agent for dabigatran is not available.  Dabigatran can be dialyzed
        (protein binding is low, the removal of about 60% of drug over 2-3 hours); however, the
        amount of data supporting such an approach is limited.  Activated prothombin complex
        concentrates (aPCCs, e.g. FEIBA), or reombinant Factor VIIa, or concentrates of
        coagulation factors, II, IX or X may be considered but their use has not been evaluated in
        clinical trials.  Protamine sulfate and vitamin K are not expected to affect the anticoagulant
        activity of dabigatran.  Consider administration of platelet concentrates in cases where
        thrombocytopenia is present or long-acting antiplatelet drugs have been used.

**25.**

        Importantly, Pradaxa™ still does not have a "black box" warning letting patients

or their prescribing doctors know that Pradaxa™ can cause sudden and irreversible bleeds.

Indeed, the relevant part of the "Warnings and Precautions" section itself remains unchanged

(with no reference to the irreversible nature of Pradaxa™ bleeds) on the current Pradaxa™ label

as shown below:

        ------------------------WARNINGS AND PRECAUTIONS------------------------

                Risk of bleeding: PRADAXA Xcan cause serious and sometimes, fatal bleeding.
                Promptly evaluate signs and symptoms of blood loss.  (5.1) Temporary
                discontinuation: Avoid lapses in therapy to minimize stroke (5.2)
                P-gp inducers and inhibitors: Effects of dabigatran exposure (5.3).

17

**26.**

The current warning is simply inadequate.  The Defendants failed in their duties to warn

and protect the consuming public, including Plaintiff's father,  Anthony Ougel, Sr.

**27.**

Even if the warnings were sufficient, which Plaintiffs strongly deny, Pradaxa™ still lacks

any benefit sufficient to tolerate the extreme risk posed by the ingestion of this drug.  Pradaxa™ is

quite simply dangerous and defective as formulated.  Defendants should have  withdrawn

Pradaxa™ from the market.

**28.**

Indeed, a FDA analysis showed that with Pradaxa™ treatment, life threatening

bleeds (a drug adverse effect) occurred at a higher rate than the strokes or systemic embolisms

Pradaxa™ is intended to prevent (1.5% per year versus 1.1% a year), suggesting that Pradaxa™

creates an extreme risk for patients and provides no benefit whatsoever.  Pradaxa™, under the

guise of providing a safe defense against strokes and/or embolisms in AF patients, subjects

unsuspecting patients to new dangers of death and injury.[12]  Defendants willfully, wantonly and

with malice withheld the knowledge of increased risk of irreversible bleeds in users of Pradaxa™

to prevent any chances of their product's registrations being delayed or rejected by FDA.  As the

manufacturers and distributors of Pradaxa™, Defendant knew or should have known that

Pradaxa™ use was associated with irreversible bleeds.

**29.**

With the knowledge of the true relationship between use of Pradaxa™ and

---

[12]Institute for Safe Medication Practices, Quarter Watch Report, January 12, 2012

18

irreversible bleeds, rather than taking steps to pull the drug off the market, provide strong warnings, or create an antidote, Defendants promoted and continue to promote Pradaxa™ as a safe and effective treatment for AF and alternative to Warfarin.  Pradaxa™ is expected to be one of Defendants' top selling drugs.

**30.**

While Defendants enjoy great financial success from their expected blockbuster drug, Pradaxa™, they continue to place American citizens at risk of severe bleeds and death. Consumers,  who have used Pradaxa™ for treatment of AF and blood thinning, have several alternative safer products available to treat the conditions and have not been adequately warned about the significant risks and lack of benefits, associated with Pradaxa™ therapy.

**31.**

Defendants, through their affirmative misrepresentations and omissions, failed to warn Anthony Ougel, Sr. and his physicians of the true and significant risks associated with Pradaxa™ use.

**32.**

As a result of Defendants' actions, Anthony Ougel, Sr. and his physicians were unaware, and could not have been reasonably known or have learned through reasonable diligence, that Anthony Ougel, Sr. would be exposed to the risks identified in this Complaint.

**33.**

Plaintiffs' father, Anthony Ougel, Sr., died on September 3, 2014 of myocardial infarction. The increased risks and subsequent medical damages associated with Anthony Ougel's Pradaxa™ use and his eventual death was the direct and proximate result of Defendants' conduct.

19

**34.**

Pradaxa™ was and is a defective product, unreasonably dangerous in light of its nature and intended use.  That defect existed when the product left Defendants' control and was the cause of Anthony Ougel Sr.'s death by myocardial infarction on September 3, 2015.  Anthony Ougel's death was caused by the use of Pradaxa™ in its intended or foreseeable manner or in the manner recommended by Pradaxa™.

**35.**

Defendants knew or should have known of the dangerous condition of its product, Pradaxa™, but failed to adequately warn or instruct physicians and consumers of the risks, dangers, and proper uses of the drug.

**36.**

Defendants have breached their duty of reasonable care in connection with the design, testing, manufacture, marketing, and/or labeling of Pradaxa™.


**EQUITABLE TOLLING OF APPLICABLE STATUTES OF LIMITATIONS**

**37.**

Defendants failed to disclose a known defect and affirmatively misrepresented that Pradaxa™ was safe for its intended use.  Further, Defendants actively concealed in true risks associated with the use of Pradaxa.  Neither Anthony Ougel, Sr., nor Anthony Ougel, Sr.'s, prescribing physicians had knowledge that Defendants were engaged in the wrongdoing alleged herein.  Because of Defendants' concealment of and misrepresentations regarding the true risks associated with Pradaxa, Anthony Ougel, Sr. could not have reasonably discovered Defendants'

wrongdoing at any time prior to his commencement of this action.

### 38.

Thus, because Defendants fraudulently concealed the defective nature of Pradaxa™ and the risks associated with its use, the running of any statute of limitations has been tolled. Likewise, Defendants are estopped from relying on any statute of limitations with regard to Anthony Ougel's death.

### 39.

Because this Complaint In Intervention is brought within one year of Anthony Ougel's death, it is timely under the provisions of Article 2315.2 of the Louisiana Civil Code.

## CAUSE OF ACTION

### 40.

Defendants were at all times relevant to this suit, and is now, engaged in the business of designing, manufacturing, testing, marketing, and/or placing in the stream of commerce pharmaceuticals for sale to, and use by, members of the public, including the Pradaxa™ at issue in this lawsuit. The Pradaxa™ placed into the stream of commerce by Defendants reached Plaintiffs' father, Anthony Ougel, Sr., without substantial change and was ingested as directed. The Pradaxa™ was defective and unreasonably dangerous when it entered into the stream of commerce and when use by Plaintiffs' father, Anthony Ougel, Sr.

### 41.

Defendants are believed to be a "manufacturer" under Louisiana Revised Statute 9:2800.53(1).

**42.**

Plaintiffs hereby set forth that the Defendants are liable to Plaintiffs under the Louisiana

Products Liability Act, La. R.S. 9:2800.54, *et seq.*:

      a.    At the time Pradaxa™ left the control of the Defendants it was defective and unreasonably dangerous due to a failure to contain adequate warnings or instructions, or in the alternative, because the product breached an express warranty or failed to conform to the other expressed factual representations upon which Anthony Ougel, Sr. and/or Anthony Ougel, Sr.'s, physician's justifiably relief, or because it breached an implied warranty, all of which proximately caused the death of Plaintiffs' father, Anthony Ougel, Sr., for which Plaintiffs seek recovery herein;

      b.    Pradaxa™ was not reasonably safe as designed, taking into account the foreseeable risks involved in its use at the time the product left the possession of the Defendants, and that such risks clearly outweighed the utility of the product or its therapeutic benefits;

      c.    At the time Pradaxa™ left the control of the Defendants it possessed a dangerous characteristic that may cause damage, and it was not reasonably safe due to inadequate or defective warnings or instructions that were known or reasonably scientifically knowable at the time the product left the possession of the Defendants. Specifically, although the Defendants were well aware that Pradaxa™ could potentially cause irreversible bleeding, and in fact, had significantly greater prevalence and severity of these side effects in the elderly, warnings of such adverse health conditions were either not included on the package insert for these products or they were not adequate to inform consumers. The Defendants failed to use reasonable care to provide an adequate warning of these dangerous characteristics to handlers and users of Pradaxa™.

      d.    The Defendants' warnings or instructions were not of a nature that a reasonably prudent drug company in the same or similar circumstances would have provided with respect to the danger. There were no warnings or instructions that communicated sufficient information on the dangers and safe use of the product taking into account the characteristics of the product, and/or the ordinary knowledge common to the consumer, such as Anthony Ougel, Sr.

**43.**

At all times pertinent and material hereto, there existed alternative feasible drugs to provide comparable benefits of Pradaxa™ to Plaintiffs' father, Anthony Ougel, Sr. without the attendant risks of irreversible bleeding.

**44.**

At all times pertinent and material hereto, Defendants knew that Pradaxa™ was unreasonably dangerous and/or defective as set forth herein.

**45.**

In the alternative, Defendants should have, at all times pertinent and material hereto, known of the unreasonably dangerous and/or defective characteristics and/or conditions of Pradaxa™, had they reasonably employed then-existing scientific and/or technical knowledge, reasonable testing, and/or other reasonable and then-accepted methods of quality assurance and/or quality control.

**46.**

The Pradaxa™ manufactured by Defendants is unreasonably dangerous due to an inadequate warning that, at the time the drug left Defendants' control, possessed a characteristic that might cause damage or injury to Anthony Ougel, Sr. and yet Defendants failed to use reasonable care to provide an adequate warning of such characteristics and/or dangers to prescribing physicians and/or users of the drug.

**47.**

In addition, and in the alternative, the Pradaxa™ manufactured by Defendants is unreasonably dangerous in design, in that at the time the drug left the Defendants' control, there

existed, upon information and belief, an alternative design for the drug that was capable of

preventing Anthoy Ougel, Sr.'s injuries and subsequent death, and the likelihood of causing

Anthony Ougel Sr.'s injuries and subsequent death and the gravity of that harm outweighed the

burden (if any) on Defendants in adopting such alternative design and the adverse effect (if any)

on the utility of the drug.

### 48.

The Defendants knew or in light of reasonably available scientific knowledge

should have known about the danger that caused the death of Anthony Ougel, Sr. for which

Plaintiffs seek recovery.  Despite this knowledge, Defendants failed to provide consumers,

including Anthony Ougel, Sr. , and Anthony Ougel, Sr.'s physicians with warnings and other

clinically relevant information and data regarding the risks and dangers associated with

Pradaxa™, as it became or could have become available to Defendants.

### 49.

A reasonably ordinary consumer who ingested Pradaxa™ would not readily

recognize ingestion of the drug involved substantial dangers.

### 50.

Anthony Ougel, Sr. did not know, nor had reason to know, at the time of his usage of

Pradaxa™, or at any time prior to its use, of the existence of the above-described defects and

inadequate warnings.

### 51.

Those defects caused serious injuries and subsequently the death of Anthony Ougel, Sr.

when the product was used in its intended and foreseeable manner, and in the manner

recommended by Defendants or in a non-intended manner that was reasonably foreseeable.

**52.**

Defendants failed to provide adequate warnings based on what it knew or should have known about the adverse effects of Pradaxa™.

**53.**

Defendants are therefore liable to Plaintiffs for any and all damages recoverable under Louisiana Civil Code Article 2315, *et seq*., for the wrongful death of their father, Anthony Ougel, Sr.

## DAMAGES

**54.**

Plaintiff s incorporate the allegations contained in the foregoing paragraphs as if fully set forth in the following paragraphs.  The facts set out above demonstrate that, as a direct and proximate result of Defendants' conduct, Plaintiffs In Intervention have suffered severe economic and non-economic losses and injuries as a result of the death of their father, Anthony Ougel, Sr. for which they are entitled to recover damages.

**55.**

Plaintiffs are entitled to recover the following damages, including without limitation the following:

  (a)  for the pain and suffering of Anthony Ougel, Sr.;

  (b)  for any and all economic losses sustained by Anthony Ougel, Sr. as a result of his Pradaxa ™ use including, but not limited to:

    1.  costs for medical care; and
    2.   loss of earnings

(c)     for any and all physical impairment and/or disfigurement sustained by Anthony Ougel, Sr. as a result of his Pradaxa ™ use;

(d)     for any and all mental pain and suffering sustained by Anthony Ougel, Sr. as a result of his Pradaxa ™ use;

(e)     for the loss of enjoyment of life sustained by Anthony Ougel, Sr. as a result of his Pradaxa ™ use;

(f)     for the grief, mental anguish and suffering of each individual plaintiff;

(g)     for loss of future support and for loss of consortium, service and society of each individual plaintiff.

(h)     all other actual damages available under applicable law;

(i)     pre-and post-judgment interest, and

(j)     costs of this suit.

## **PRAYER**

WHEREFORE, Plaintiffs ask that Defendants Boehringer Ingelheim Pharmceuticals, Inc., Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH, and Bidachem S.p.A. be cited to appear and answer herein.  That upon final trial, Plaintiffs have judgment against Defendants Boehringer Ingelheim Pharmaceuticals, Inc., Boehringer Ingelheim Pharma GmbH & Co. KG, Boehringer Ingelheim International GmbH, and Bidachem S.p.A. for actual damages, costs of court, and any other relief to which Plaintiffs may be entitled.

Respectfully submitted

# **Braud & Braud**
Attorneys at Law
1250 S.W. Railroad Ave., Suite 220 B
Hammond, LA 70403

Telephone:     (985) 340-5160
Facsimile:     (985) 340-5162
Email:         braud@bellsouth.net


BY:     _____/s     *John O. Braud*_____
             JOHN O. BRAUD
             LA. Bar Roll Number 3410